### UNITED STATES DISTRICT COURT

### MIDDLE DISTRICT OF LOUISIANA

**MICKEY J. TANKERSLEY**                    **CIVIL ACTION NO.: 3:22-CV-00285**

**VERSUS**                                           **JUDGE JOHN W. DEGRAVELLES**

**PROTECTIVE INSURANCE**
**COMPANY, ET AL**                    **MAGISTRATE JUDGE WILDER-DOOMES**

<u>**WRITTEN REASONS FOR JUDGMENT**</u>

### I.       INTRODUCTION

This personal injury suit arises from a motor vehicle accident which occurred on April 9, 2021, in Desoto Parish, Louisiana. (Doc. 91 at 1.) At the time of the accident, the vehicle being driven by plaintiff, Mickey J. Tankersley ("Tankersley" or "Plaintiff") was struck by a 2009 Freightliner being driven by Timothy J. Stephens ("Stephens"), (Doc. 92 at 2), who was in the course and scope of his employment with S&J Potashnick Transportation, Inc. ("PTI"), (Doc. 91 at 3). Stephens and PTI were insured at the time of the accident under a policy of insurance issued by Protective Insurance Company ("Protective"). (Doc. 92 at 2). The parties have stipulated that Stephens was 100% at fault in causing the collision. (*Id.*) Although liability is stipulated, damages are contested. (*See* Doc. 91 at 8; Doc. 92 at 4–5.)

### II.       PARTIES, JURISDICTION, AND APPLICABLE LAW

Tankersley is a citizen of Louisiana; Stephens is a citizen of Missouri; Protective and Baldwin & Lyons, Inc. are citizens of Indiana; and PTI is incorporated in Oregon with its principal place of business in Missouri. (Doc. 63 at 1.) Therefore, the Court has diversity of citizenship jurisdiction. 28 U.S.C. § 1332. In a diversity case, the measure of damages is governed by state law. *Concise Oil & Gas P'ship v. La. Intrastate Gas Corp.*, 986 F.2d 1463, 1472 (5th Cir. 1993) (citing *Smith v. Indus. Constructors, Inc.*, 783 F.2d 1249, 1250 (5th Cir. 1986)). "It is well

established that in diversity cases in the Fifth Circuit state law governs the measure of damages." *Crowe v. Stewart Mach. & Eng'g co., Inc.*, No. 92-3535, 1993 WL 360806, at *4 n.7 (5th Cir. Aug. 30, 1993) (quoting *Smith*, 783 F.2d at 1250). The only issue in this case is the extent of damages Tankersley suffered and the appropriate award.

## III.    THE TRIAL

The case was tried to the bench on December 6, 2023. (Doc. 96.) Four witnesses testified in person at trial, all presented by Plaintiff: Tankersley, his wife Stacie Tankersley, vocational rehabilitation expert Louis Lipinski, and economist Randolph Rice. (Doc. 100 at 2.) The depositions of three of Tankersley's four treating doctors were offered by Plaintiff and Defendants as joint exhibits. (Doc. 87 at 2.) These doctors were David S. Muldowny, M.D. (Joint Exhibit ("JE") 11, taken 3/30/23), Malcom J. Stubbs, M.D. (JE 12, taken 4/3/23), and Sean Stehr, M.D. (JE 13, taken 4/21/23; JE 14, taken 10/13/23).[1] Defendants offered no live testimony and no deposition testimony other than that of Tankersley's three physicians.

## IV.    PLAINTIFF'S HEALTH, EMPLOYMENT, AND RECREATIONAL ACTIVITIES BEFORE THE ACCIDENT

At the time of the accident, Tankersley was 58 years old, (Plaintiff's Exhibit 1 at DPS0004), and had been married to Stacie Tankersley for 11 years. (Doc. 100 at 118.) Tankersley and his wife Stacie have 7 children and 23 grandchildren. (*Id*.) They live in Hineston, Louisiana, a small, rural community between Alexandria and Leesville. (*Id*. at 16, 118.) Tankersley graduated from high school but went no further in his formal education. (*Id.* at 97.)

In the few years preceding the accident, Tankersley was in generally good health, although he would occasionally see a chiropractor for pain in his low back. (*Id.* at 27–28.) He estimated that he had seen a chiropractor (Dr. Guillory) three or four times in the two to three years preceding

---

[1] Two depositions were taken of Dr. Stehr: his original and updated depositions.

the accident. (*Id.* at 28; *see also id.* at 120, 184.) His complaints would resolve quickly with Dr. Guillory's treatments. (*Id.* at 124.) Tankersley "would see Dr. Guillory two or three times[,] and then he would be fixed." (*Id.*)

For many years before the accident, Tankersley worked as a mechanic and millwright at plants near his home. (*Id.* at 28.) For twelve years, he worked at International Paper and for seven years at CLECO. (*Id.* at 28–30.) He would also work on a piecemeal basis for other plants like RoyOMartin. He described this work as "maintenance on all equipment, heavy lifting, getting into awkward positions, welding [and] pulling on wrenches." (*Id.* at 28.) His work was skilled but physically demanding. (*Id.* at 31.) He would work as many as 10 hours per day. (*Id.*) While working for CLECO between 2015 and 2017, he earned over $70,000 per year. (*Id.* at 200–02; Plaintiff's Exhibit 8.)

In addition to his employment, he and his wife operated a cattle and horse ranch called Tankhill. (Doc. 100 at 92–93.) The running and maintenance of the ranch included activities like feeding the horses and cattle on a daily basis, which were time consuming and demanding. (*Id.* at 120.) This was also home for him and his wife. (*Id.* at 92–93.) Before the accident, the Tankersleys were "very active," (*id.* at 121), dancing, taking road trips, playing games, and engaging in other activities with their children and grandchildren like volleyball, (*id.* at 121–22), football and other sports, (*id.* at 40–41), playing pool, and taking road trips for fun, (*id.* at 121–22.)

Before the accident, Tankersley was a very active participant in a competitive sport called team rodeo which he described. (*Id.* at 19–25.) In it, two riders on horseback lasso a steer released from a chute. (*Id.* at 15.) One rider (the "header") lassos the head, tying the other end of the rope to the saddle horn and reigning the horse. (*Id.* at 20–21.) Unlike calf roping, the header does not dismount from his horse. (*Id.* at 21.) The other rider, the "heeler," ropes the back two legs of the

3

steer and brings it down. (*Id.*) The team with the fastest time wins. (*Id.* at 79.) Tankersley was usually the header. (*Id.* at 19–25.)

Before the accident, Tankersley would compete in local team roping competitions two to three times per week and larger, sanctioned, regional events at least once a month. (*Id.* at 25–26.) After work, Tankersley would practice at an arena he and his wife built at their home. (*Id.* at 26.) He would practice as many as five or six days a week, four to five hours a day, roping as many as "40 [or] 50 head a day." (*Id.* at 31–32.)

In 2018, he left CLECO to start a business moving nursery plants from various nurseries in the area to customers. (*Id.* at 96.) When he and his wife started the business, they knew they would not earn a profit for the first few years because of the purchase of capital equipment and other start-up expenses, and, indeed, his income went down. (*Id.* at 24–25, 126–27.)

Tankersley and his wife gradually transitioned from moving plants for nurseries to hauling alfalfa, picking up loads in various points in Texas and delivering them to customers in Louisiana. (*Id.* at 127, 157–58.) This was the business Tankersley was in at the time of the accident. (*Id.* at 149.) Before the accident, he would unload the hay (on average weighing 85 to 100 pounds per bail) by hand onto pallets. (*Id.* at 38.)

Once the Covid-19 pandemic hit in the spring of 2020, their nursery business basically "shut down" and had not recovered at the time of the accident in April of 2021. (*Id.* at 127; *see also id.* at 35–36.) They sold the nursery business in January of 2021, though they kept the hay business. (*Id.* at 127.)

## V.    THE ACCIDENT[2]

Tankersley and Stephens were involved in a motor vehicle crash on I-49 in Desoto Parish on April 9, 2021. (Doc. 63 at 3, Pretrial Order, Established Fact ("EF") 1.) At the time of the crash, Tankersley was traveling in the inside (left) southbound lane on I-49, and Stephens was traveling in the outside (right) southbound lane. (*Id.*, EF 2.) As Tankersley proceeded around Stephens's vehicle, Stephens attempted to change lanes into Tankersley's lane of travel and collided with Tankersley's vehicle, causing it to leave the roadway and enter the median. (*Id.*, EF 3 and 4.)

"Stephens was solely at fault in causing the accident." (*Id.*, EF 5; *see also* Doc. 96, Joint Stipulation 3; Doc. 91 at 3, Defendants' Proposed Finding of Fact 15.) This stipulation was reiterated at the beginning of the trial. (Doc. 100 at 6.) At the time of the collision, Stephens was in the course and scope of his employment with defendant PTI. (Doc. 63, EF 6.) Protective provided insurance coverage to both Stephens and PTI for the types of damages sustained by Tankersley on the date of the accident. (*Id.*, EF 7.)

At the time of the accident, Tankersley's vehicle was hauling a trailer fully loaded with alfalfa. (Doc. 100 at 44.) He described the incline from the interstate into the median as steep in that location and described what happened after he entered the median as a "rough ride," bouncing around in the truck. (*See generally id.* at 42–43.) He was concerned that the trailer might flip over. (*Id.*)

## VI.    PROPERTY DAMAGE

Tankersley described extensive damage to his truck which was declared a total loss. (*Id.* at 43–45.) Photographs of the truck post-accident were introduced as Exhibits D-14, P-9, and P-10 (*Id.* at 109–10.) The insurance company however paid some $23,000 to repair the truck, and

---

[2] Although liability is stipulated, the description of the accident and its immediate aftermath is given for the purpose of describing the injuries and damages Tankersley suffered.

Tankersley bought it back. (*Id.* at 75–76.) Plaintiff's only property damage claim is for the $500 deductible for which he was responsible. (*Id.* at 43–44; Doc. 103 at 19.)

## VII.    INJURIES, TREATMENT AND DAMAGES

Immediately following the accident, Tankersley did not think he was injured, but later that night and the next morning he began to feel "pain from [his] neck going down into [his] right shoulder[,] and it eventually started going down into [his] elbow and into [his] hands." (*Id.* at 45.)

Tankersley began his medical treatment from the accident on April 14, 2021, five days after the accident, with Dr. Wilton Guillory III, the chiropractor he had seen periodically before the accident for low back muscle pain. (*Id.* at 46; Doc. 103 at 5.) Dr. Guillory's medical records were introduced as JE 1. Dr. Guillory diagnosed neck pain and stiffness, low back pain, and radiating pain in his upper and lower extremities. (JE 1, Guillory's Medical Records, at 19–20.) He was treated by Dr. Guillory from April 14, 2021, to December 29, 2021. (*Id.* at 28–29.)

After Dr. Guillory's chiropractic treatment failed to improve Tankersley's condition, (Doc. 100 at 7), Dr. Guillory ordered cervical and right shoulder MRIs, which were performed on May 4, 2021. (Doc. 103 at 6.) Both MRIs showed significant findings, and Dr. Guillory referred Tankersley to Sean Stehr, M.D. of Alexandria, La., an interventional pain management specialist. (JE 13, First Deposition of Stehr, at 10.) Dr. Stehr's records were introduced as JE 3. Tankersley began treating with Dr. Stehr on May 18, 2021. (*Id.* at 2–4.)[3]

The cervical MRI showed, among other things, "a right paracentral disc herniation which had some contact [with the nerve] . . . in the area of the neural foramen." (JE 12, Deposition of

---

[3] There were no objections to Dr. Stehr's expertise. He is board certified in physical medicine, rehabilitation, and pain management and is otherwise well qualified and experienced in these fields. (JE 13, First Deposition of Stehr, at 6–8.) Based on the Court's review of his two depositions, (JE 13, 14), the Court accepts him as an expert in physical medicine, rehabilitation, and pain management.

Stubbs, at 16–17.) "[I]f the disc is sitting on the nerve, that's often a source of pain . . . ." (*Id.* at 17; *see also* JE 13, First Deposition of Stehr, at 13–14.)

The shoulder MRI showed "a small full thickness partial tear of the . . . tendon without any retraction [and] surrounding tendinosis of the infraspinatus tendon of the rotator cuff [as well as] a type 1 AC separation with some edema noted within the AC joint, in addition to the arthritic changes." (JE 12, Deposition of Stubbs, at 13.)

Because conservative treatment did not resolve Tankersley's complaints, Dr. Stehr performed a right-sided transforaminal epidural steroid injection (TFESI) with sedation at C6-7 on May 26, 2021. (JE 13, First Deposition of Stehr, at 16–19.) This involves placing a needle in the disc space under fluoroscopy and injecting the inflamed nerve with a steroid. (*Id.*)

On June 3, 2021, Tankersley began treating with Dr. Malcolm Stubbs, an orthopedic surgeon in Lafayette[4] for the injury to his right shoulder. (JE 12, Deposition of Stubbs, at 10; *see also* JE 4, Stubbs's Medical Records.) Dr. Stubbs diagnosed Tankersley's injury as a "a rotator cuff tear of the right shoulder, a right AC joint separation, osteoarthritis of the right shoulder, a degenerative tear of the labrum of the right shoulder." (JE 12, Deposition of Stubbs, at 18.) On the same day, Dr. Stubbs administered a lidocaine injection, which eased Tankersley's right shoulder pain. (*Id.* at 19–20.)

However, Dr. Stubbs believed that much of Tankersley's symptomology was from his cervical injury, (*id.* at 21), and referred him to his partner Dr. David Muldowny, an orthopaedic spine surgeon.[5] (*Id.* at 21, 32; *see also* JE 11, Muldowny Deposition, at 11). Muldowny saw

---

[4] Dr. Stubbs is a well-qualified, board-certified orthopedic doctor, (JE 12, Deposition of Stubbs, at 6–9), and the Court accepts him as such without objection by Defendants, (*id.* at 9).

[5] Dr. Muldowny is a well-qualified, board-certified orthopedic surgeon, (JE 11, Muldowny Deposition, at 5–11), and the Court accepts him as such without objection by Defendants, (*id.* at 10–11).

Tankersley on July 14, 2021. (JE 11, Muldowny Deposition, at 11; *see also* JE 6, Medical Records of Muldowny, at 3.)

Dr. Muldowny diagnosed cervical spondylosis with radiculopathy. (JE 6, Medical Records of Muldowny, at 9.) After more conservative treatment failed, he ultimately ordered interlaminar injections, (*id.* at 12), which failed to resolve the pain. (*Id.* at 16.) Unfortunately, "nonsurgical treatment including physical therapy" failed and an updated MRI and EMG/NCV reconfirmed the diagnosis of radiculopathy at C5-C6 and C6-C7. (*Id.* at 22.) Dr. Muldowny wrote: "He is miserable. . . . I recommend we proceed with ACDF at C5-C6 and C6-C7 with plate and allograft." (*Id.*)

Although Tankersley had abnormalities at three levels, (*see id.* at 12), which might have justified a four-level fusion, Muldowny chose to recommend a two-level fusion:

> I recommended what's called [an] "anterior cervical discectomy and fusion" at C5-C6 and C6-C7. The EMG and nerve conduction velocity study that we had done previously did not show any evidence of a C4 nerve root issue. It showed primarily C6 and C7 radicular changes . . . . So we opted to ignore the abnormalities at C3-C4 and concentrate on what seemed to be causing the radicular, the arm pain hoping that it's most of the neck pain as well. . . . So that's sort of a calculated gamble that we take by limiting  - - in order to limit the size of the surgery.

(JE 11, Muldowny Deposition, at 27.)

When asked why he did not just do a four-level fusion, he responded, "Well, you can. It's just it's a four-level fusion[,] so his neck is going to be fairly stiff afterwards. He's going to lose a fair amount of motion." (*Id*. at 27.)

On November 18, 2021, Dr. Muldowny performed an anterior cervical dissection and fusion (ACDF) at C5-6 and C6-7 with plate and allograft. (*Id.* at 28.) Dr. Muldowny described the operation in more detail at pages 28–31 of his deposition.

Dr. Muldowny considered the operation a success. (*Id.* at 34.) Yet, following the surgery, although Tankersley improved, he continued to suffer significant discomfort and, as a result of the surgery, difficulty swallowing. (*Id.* at 35, 42.)

While seeing Doctors Stubbs and Muldowny, Tankersley also continued to see Dr. Stehr who performed another TFESI on May 18, 2022, (JE 13, First Deposition of Stehr, at 23), and again on September 14, 2022, (*id.* at 25).

Dr. Stehr performed medial branch blocks (also known as radiofrequency ablations ("RFTC")) at C4, C5, C6, and C7 on November 30, 2022; December 7, 2022; and December 14, 2022. (*Id.* at 28–37.)

Dr. Stehr performed another right-sided radiofrequency ablation ("RFTC") at C4, C5, C6, and C7 on December 14, 2022, and a left sided RFTC at the same levels on January 5, 2023. (*Id.* at 36.) While these procedures improved his pain, unfortunately, the ablated nerves regenerated necessitating a second round of RFTCs on June 28, 2023 and July 12, 2023. (JE 14, Second Deposition of Stehr, at 6–8, 10–11.)

Dr. Stehr testified in his deposition that as long as the pain recurred, Tankersley would require additional RFTCs until they ceased being effective, and his need for this future treatment was more likely than not related to the April 9, 2021 collision. (*Id.* at 30–32.)

Dr. Stubbs testified that, assuming the truth of the history given by Tankersley regarding the accident and onset of symptoms, the injuries for which Stubbs treated Tankersley and the related treatment were, more likely than not, caused by the April 9, 2021 wreck. (JE 12, Stubbs Deposition, at 22–23.) Stubbs found Tankersley to be honest and truthful, and he did not believe Tankersley was malingering. (*Id.* at 22.)

Regarding preexisting conditions, Stubbs testified that, if asymptotic before the accident and symptoms began afterward, an accident like the one Tankersley was involved in could "trigger" the onset of symptomology. (*Id.* at 36.)

Dr. Muldowny testified that the injury and treatment he rendered to Tankersley, therefore, including the surgery that he performed on November 19, 2021, were likely related to the April 9, 2021, collision. (JE 11, Muldowny Deposition, at 45, 68.) He testified that Tankersley "began experiencing pain afterwards because of the [preexisting degenerative conditions] coupled with what happened . . . to him in the car wreck . . . ." (*Id.* at 65–66.) He, like his partner Stubbs, found Tankersley to be honest, truthful, and not malingering. (*Id.* at 44–45.)

Dr. Muldowny also testified that Tankersley will likely require a second fusion surgery at C4-5. (*Id.* at 42–43, 55.) "It's just I think that more likely than not he's going to end up having those other two levels fused because they're probably going to go bad over time." (*Id.* at 55–56.) Muldowny opined that the increased symptoms were "from the facet joints up above at C3-C4 and maybe C4-C5, which may have been accentuated by the fact that he had a fusion at C5-6 and C6-7." (*Id.* at 58.) He testified that "over time, I would expect the radio frequency ablations will probably become less effective and may not work and then he may require surgery. More likely than not he will require the surgery that we have talked about." (*Id.* at 62–63.)

Dr. Stehr agreed with Dr. Muldowny that Tankersley would probably need an additional two-level fusion of the cervical spine. (JE 13, First Stehr Deposition, at 42–43; JE 14, Second Stehr Deposition, at 15.)

Dr. Stehr testified in his trial deposition that the treatment he rendered to Mr. Tankersley, including the medial branch blocks, TFESIs, and RFTCs, was, more likely than not, related to the April 9, 2021 collision. (JE 13, First Stehr Deposition, at 44.)

While none of Tankersley's treating doctors put specific restrictions on his work or recreational activities, (Doc. 100 at 97), they counselled him to avoid doing activities that caused pain or discomfort.

> I asked [Dr. Muldowny] about restrictions and he told me your body will let you know what you can and can't do. He said do what you think. He said, and your body will tell you if you overdid it and then you'll know, and he's right.

(Doc. 100, Tankersley's Testimony, at 64; *see also* JE 14, Second Stehr Deposition, at 30 ("I would leave it to him on restrictions in the way of if this hurts, don't do it."); Doc. 100, Mrs. Tankersley Testimony, at 161 ("After the surgery [Dr. Muldowny] told me that he needed to try things he was doing before, but if it hurt to stop."); *see also id.* at 169 ("[T]hat's when he told me that, no, he doesn't need to be doing stuff that hurts him. If he tries it and he does it, and it hurts, then he needs to stop."); *see also generally id.* at 168–70.)

As is discussed in more detail in connection with his damages, Tankersley has returned to some of his work and recreational activities, but given the pain caused when he has attempted to do what he did previously, he has been forced to significantly reduce and modify both his work and recreational activities due to pain.

Tankersley's trial testimony and that of his wife's regarding Tankersley's injuries, complaints, and treatment were consistent with the testimony of his treating doctors. All three of Tankersley's treating doctors found Tankersley to honest, truthful, and not exaggerating. (JE 12, Stubbs Deposition, at 22; JE 11, Muldowny Deposition, at 44–45; JE 14, Second Stehr Deposition, at 17.) The Court likewise found Tankersley to be a highly credible witness. His damage testimony was not only supported by his treating doctors but was also corroborated by his wife's testimony which the Court also found credible.

### Injuries – Causation

The medical testimony is uncontradicted that Plaintiff's injuries, aggravation of preexisting conditions, and the treatment for both as summarized above, as well as the projected need for future treatment, were caused by the subject accident. (*See, e.g.*, JE 13, First Stehr Deposition, at 42–44; JE 11, Muldowny Deposition at 45, 65–66, 68; JE 12, Stubbs Deposition, at 22–23, 36.) While Defendants argue that "[t]he plaintiff's losses are simply a result of the plaintiff's doing," (Doc. 102 at 14), there is no medical testimony that supports this allegation, and indeed, all of the medical testimony contradicts it.

### Damages – Property Damage

The parties stipulated that the $500 deductible represents the full extent of Plaintiff's property damage loss. (Doc. 100 at 44; Doc. 103 at 11.)

### Damages – Past Medical Expenses

Plaintiffs introduced evidence without objection of the past medical expenses in connection with Plaintiff's injuries totaling $161,158.78. (Plaintiff's Exhibits 4(a)–4(m).) As mentioned above, all three treating doctors attributed the need for these expenses to the subject accident. Defendants' argument that the past medical expenses are attributable to Tankersley's horse-riding activities is contradicted by the medical evidence.

### Damages – Future Medical Expenses

As mentioned above, Tankersley's doctors testified regarding two forms of needed future medical treatment. First, as long as the ablations are benefiting Tankersley (as they presently are), he should periodically undergo these procedures. (JE 13, First Stehr Deposition, at 40–42; JE 14, Second Stehr Deposition, at 11; JE 11, Muldowny Deposition, at 41–42.) Dr. Stehr testified that Tankersley would need them every six months until they were no longer effective. (JE 13, First

Stehr Deposition, at 59.) Dr. Muldowny testified the same except said every nine to 12 months. (JE 11, Muldowny Deposition, at 41–42.) Tankersley said he would continue the ablations until they no longer work, at which time he would undergo the surgery. (Doc. 100 at 71–72.) The Court chooses every six months since this was the recommendation of the physician who performs the ablations. Defendant offered no evidence that contradicted or called into question this testimony.

Plaintiff argues that, given the estimates for the cost of the ablations (a total cost of $12,056.00 for each round,[6] which would include one ablation for each side) and their needed frequency (every six months) for another seven to ten years, the cost for the ablations would be between $168,784.00 and $241,120.00. (Doc. 103 at 13–14.) The Court finds that the cost of ablations for 7 years, or $168,784.00 is reasonable and supported by the evidence.

The second form of future treatment that will be needed is another surgery. Again, the need for it is established by the medical testimony, (*see, e.g.*, JE 11, Muldowny Deposition, at 42–43, 55), and is not contradicted or called into question by any evidence submitted by Defendants. As cited above, the uncontradicted medical testimony is that the accident in question caused the need for the future surgery.

Plaintiff offered estimates for the costs for future surgery totaling $76,583, (Doc. 103 at 14 (citing Plaintiff's Exhibits 5(a)–(d)).) These include the estimate for the surgeon's fee ($24,633); the hospital ($33,800); the anesthesiologist ($10,150); and diagnostic monitoring ($8,000). (*Id.*) These exhibits were offered without objection, and Defendants did not question the accuracy of these future costs.

---

[6] While Plaintiff's Exhibit 5(e) estimates the cost of the ablations to be $3,900.00 per side, the actual bills show the actual costs of the last three ablations was $5,933.01, $6,121.00, and $6,031.00. (Plaintiff's Exhibit 4(c) at 3–5.) The Court has used the average of $6,028.00 per side or $12,056.00 per round.

The total award for future medical costs is therefore $245,367. The Court notes that Plaintiff did not offer a life care plan or other evidence of other future medical expenses such as physical therapy, medicines, and the like, and thus no amounts are awarded for such items.

### Damages – Past and Future Loss of Earning Capacity

Tankersley worked as a mechanic/millwright for a number of employers prior to the wreck including International Paper, a paper mill, and CLECO, a power company. (Doc. 100 at 28–30.) While at CLECO, he earned $71,645.68 in 2015, $78,601.67 in 2016, and $75,425.27 in 2017. (Defendants' Exhibit 12 at 4.) Prior to the accident, his jobs always involved significant physical demands, (Doc. 100 at 28–31), and he usually worked 10-hour days, (*id.* at 31).

In 2018, approximately a year and a half before the wreck, Tankersley quit working at CLECO so that he and his wife could start their own business delivering nursery plants and alfalfa hay. (*Id.* at 32–34.) Because of the start-up costs to begin the business as well as the Covid-19 pandemic, which started in the spring of 2020, the business was unsuccessful and operated at a net loss. (*Id.* at 103–06, 117; Defendants' Exhibits 2–5.) Plaintiff and his wife therefore sold the nursery transport business in January of 2021, a few months before the April 9, 2021 accident in question. (Doc. 100 at 35–37.)

While attempting to start up the business, both before and after the accident, Tankersley did sporadic work for Turbine Services Maintenance Division, Inc. ("TSMD"), earning $2,331 in 2019 and $1,327 in 2020. (Defendants' Exhibit 12 at 4.) The Court has already recounted Plaintiff's injuries and resultant medical treatment, including surgery.[7] Since the accident, Tankersley's earned income was from some work performed for TSMD, where he earned $6,041.00 in 2021 and $11,177.50 in 2022. (*Id.*)

---

[7] There is also a chronological summary of Tankersley's medical treatment in pages 1–7 of Plaintiff's Exhibit 8, Report of Louis Lipinski.

During his medical treatment, Tankersley's attempted to return to work for TSMD but could not do physical work and could only supervise. (Doc. 100 at 49.) Even then, he could only work two or three days and then would have to take off a day "just from . . . walking around and walking up and down the steps." (*Id.* at 50.)

Tankersley testified that following his recovery from surgery and his return to work for TSMD, he has only been able to do mostly non-physical supervising, (*id.* at 65), and Mrs. Tankersley testified that he supervises for TSMD "on occasion," (*id.* at 149). Tankersley described his work there as showing other workers what needs to be done at a particular job site. (*Id.* at 49–50; *see also id.* at 65 ("I'm a glorified paper pusher pretty much the way I look at it.").) He testified persuasively that he is unable to return to the hard manual work involved in pulling on wrenches or running a crane, and indeed, TSMD has hired someone else to run the crane. (*Id.* at 66.) Tankersley testified that when the regular crane operator did not show up for work, he tried to operate the crane, and "I did pay for it dearly . . . ." (*Id.*)

Defendants argue strenuously that Plaintiff has suffered no loss of future earning capacity because he has returned to his original job. (Doc. 102 at 5 ("The plaintiff has returned to work at the same company in the same capacity as before the subject accident.").) "The plaintiff's treating doctors have not placed work restrictions[,] and despite a few reports of pain, the plaintiff continues to report to work and perform work when he is required." (*Id.* at 6.)

This argument ignores the uncontradicted and credible evidence that Tankersley is no longer able to do the kind or duration of work he did before the accident, and when he has made an effort to do so, has "[paid] dearly." (Doc. 100 at 66.) While Tankersley has resumed his hay hauling business, he now has to rely on other people and equipment to assist in the purchase, loading, and unloading of the hay. (*Id.* at 52, 136.)

Based on the testimony of Tankersley, his wife, his treating doctors, and Louis Lipinski, Tankersley's vocational rehabilitation expert, all of whose testimony is consistent, the Court concludes that Tankersley is no longer able to do the kind or amount of work he did before the accident and has suffered a significant loss of earning capacity as a result of the accident.

Lipinski testified credibly that Tankersley's pre-injury earning capacity to be $87,596.04. (*Id.* at 203; *id.* at 188–203 (Lipinski's detailed explanation for how he arrived at that amount is found in his trial testimony.).)[8] Lipinski then testified that his post-injury earning capacity was between $25,248.10 and $32,094.11, (*id.* at 205),[9] yielding a yearly loss of earning capacity between $55,101.93 and $62,347.97, (*id.* at 206). The Court notes that Defendants offered no vocational rehabilitation expert testimony to challenge or offer an alternative to Lipinski's opinions.

Using this amount as a starting point, economist G. Randolph Rice calculated Tankersley's past loss of earning capacity between the time of his accident and the time of trial on December 6, 2023, as $210,125. (*Id.* at 227.) Rice testified that the present value of Tankersley's loss of future earning capacity is $366,649.00. (*Id.* at 228.) Rice explained how he derived these numbers. (*Id.* at 226–28; 230–34; *see also* Plaintiff's Exhibits 7, RICE 001–003 and 7A, Rice's Earlier Reports.) Defendants offered no economic testimony to the contrary. The Court found Rice's testimony to be credible and persuasive.

If one focuses exclusively on what Tankersley was earning at the time of his accident (i.e., nothing from his start-up business and $1,327 from TCMD in 2020, the last full year before his accident) and compare that with his income following his accident ($6,041.00 in 2021 and

---

[8] Lipinski's report was also introduced into evidence without objection as Plaintiff's Exhibit 8.
[9] The record reflects that Tankersley's actual earnings in 2022 was $11,177.50. (Defendants' Exhibit 12 at 4; Doc. 100 at 206.)

$11,177.50 in 2022), Tankersley actually made more after the accident than he was making at the time it occurred. (*Id.* at 107.) But the Court is permitted to look to his past and future loss of earning *capacity* to measure Tankersley's earnings loss. *Folse v. Fakouri*, 371 So. 2d 1120, 1122 (La. 1979); *Scarberry v. Entergy Corp.*, 2013-0214 (La. Ct. App. 4 Cir. 2/19/14); 136 So. 3d 194, 216, (citing *Folse*, 371 So. 2d at 1123).

In *Folse v. Fakouri*, the jury awarded $47,000 for plaintiff's past loss based on his earning capacity even though his loss based on his actual wages was significantly less than that. 371 So. 2d at 1123–24. The Court of Appeal reduced the award, but the Supreme Court reinstated it.

> In the trial court the jury awarded Folse $47,000 to reimburse him for the loss of past earnings. The Court of Appeal reduced this award to $27,500. The appellate court was of the opinion that the trier of fact possesses considerable discretion in making awards for loss of future earnings because of the speculative nature of those awards and because that type award cannot be calculated with mathematical certainty. This same broad discretion, the court [of appeal] found, is not applicable where loss of past earnings are involved. Presumably this conclusion was reached because past losses were considered to be more accurately ascertainable.

*Id.* at 1122.

But the Supreme Court disagreed with the Court of Appeal. Applying La. Civ. Code art. 1934(3) (now art. 1999) "by analogy," the Court stated:

> Because the Court of Appeal apparently disregarded the claim for loss of past earning capacity, and considering the fact that there was evidence in the record, including the expert opinion of the actuary, which would support the jury award, we find no abuse of the "much discretion" which "must be left to the . . . jury in its award for loss of past earnings and past earning capacity."

*Id.* at 1123–24 (citation omitted). *See also Bernard v. Cas. Reciprocal Exch.*, 534 So. 2d 1348 (La. Ct. App. 5 Cir. 1988) (awarding past loss of earning capacity to a plaintiff who was unemployed at the time of the accident).

Defendants attack Plaintiff's past and future loss of earning capacity claim in three ways arguing that: first, Plaintiffs' experts erroneously utilized the earnings he made at a job he left years

earlier, (Doc. 104 at 4–5); second, Plaintiff erroneously based his earning capacity on the wrong

occupation, (*id.* at 5–6); and third, he failed to account for the fact that he eventually returned to

the same job he had before the accident, (*id.* at 6–7; see also similar arguments made by Defendants

in Doc. 107 at 5–8). As mentioned above, the lay and medical testimony is uncontradicted that

while Tankersley did return to the same employer following the accident, his job duties as well as

the amount of time spent with the employer changed.

But more fundamentally, Defendants misunderstand the nature of loss of earning capacity.

Many factors could have entered into the jury's deliberations on the question of plaintiff's loss of the capacity to earn more during the four year-eight month period prior to trial. . . . The [trier of fact is] entitled to determine from these and other factors in the record the probabilities and estimates of plaintiff's ability to earn money. *What plaintiff earned before and after the injury does not constitute the measure. Even if he had been unemployed at the time of the injury he is entitled to an award for impairment or diminution of earning power.* And while his earning capacity at the time of the injury is relevant, it is not necessarily determinative of his future ability to earn. *Coco v. Winston Industries, Inc.*, 341 So. 2d 332 (La. 1976). Damages should be estimated on the injured person's ability to earn money, rather than what he actually earned before the injury.

*Folse*, 371 So. 2d at 1123 (emphasis added). *See also Bland v. Green*, 2019-0550 (La. Ct. App. 4

Cir. 6/27/19); 363 So. 3d 376, 380–81.

In *Bland v. Green*, *supra*, the court rejected the identical argument Defendants make here.

We also agree with [the plaintiff] that the trial court erred as a matter of law in finding that Dr. Rice's calculation could only be reliable if it was directly tied to [the plaintiff's] pre-injury earnings. This directly contradicts the law. As the Louisiana Supreme Court has said, "Damages should be estimated on the injured person's ability to earn money, rather than what he actually earned before the injury." [*Folse*, 371 So. 2d at 1123]; *see also* [*Carter v. Baham*, 95-2126 (La. Ct. App. 4 Cir. 10/9/96); 683 So. 2d at 307] (["]What a plaintiff earned before and after the injury does not constitute the measure of loss of . . . future earning capacity.").

We thus conclude that the trial court was manifestly erroneous in finding that the calculation of [the plaintiff's] lost earning capacity was required to be based upon his pre-injury earnings. *See Hobgood v. Aucoin*, 574 So.2d 344, 346 (La. 1990) ("[D]amages for decreased earning capacity . . . [are] determined by deducting plaintiff's earning ability after the injury from his earning ability immediately prior

to the injury rather than by deducting his income after the injury from his income prior to the injury.") (Emphasis added.)[.]

*Bland*, 363 So. 3d at 380–81. *See also Becnel v. Lamorak Ins. Co.*, No. 19-14536, 2022 WL 2182527, at *3 (E.D. La. June 16, 2022) (holding that the survivors of a decedent who was retired at the time of his death could nonetheless recover for the decedent's loss of earning capacity); *Nkansah v. Martinez*, No. 15-00646, 2017 WL 2812733, at *7 (M.D. La. June 28, 2017) (deGravelles, J).

In conclusion, the Court finds that Tankersley suffered a past loss of earning capacity in the amount of $201,125 and a future loss of earning capacity in the amount of $366,649.

### General Damages

For eight months following the accident and prior to surgery, Tankersley's doctors tried various forms of conservative treatment including chiropractic treatment, medications, and epidural steroid injections. During this time and after, Tankersley was reluctant to take the pain medication hydrocodone because, at a previous time, he had almost become addicted. (Doc. 100 at 53.) The pain from the subject accident was so intense that Tankersley had difficulty, sleeping which caused him to sleep on the couch. (*Id*. at 55.) Unfortunately, his condition failed to improve and deteriorated to the point that, in his doctor's words, "[h]e is miserable[,]" (JE 6, Medical Records of Muldowny, at 22; Doc. 100 60–61), and thus his doctor recommended the two level cervical surgery, which was performed on November 18, 2021, (JE 11, Muldowny Deposition, at 28–31).

Tankersley described the severe pain he underwent following surgery. (Doc. 100 at 62–63.) During that time, his wife had to help him shower, get dressed, and do all of the considerable work required to run the ranch. (*Id.* at 52.) The fact that his injury required his wife to take care of him after the surgery and at other times since then was also a source of great embarrassment and

frustration for him. He stated, "I'm supposed to be the one who takes care of my family." (*Id.* at 62.)

Following his recovery from surgery and despite continued treatment, Tankersley has continued to have pain and stiffness in his neck and a burning sensation from his neck down into his shoulder area.

> I still have a disk that is out that still causes - - it's like having a constant crick in your neck would be the best way I can describe it. It doesn't go away and if I do very much stuff I'll get - - I'll get a burning sensation down my neck into my shoulder blades now. So some stuff I've really got to watch what I do or, you know, how much of it I do or slow down doing it.

(*Id.* at 63–64.)

Tankersley's wife testified that his difficulty sleeping required him to leave their bed to sleep on the couch this has persisted until today causing tension, friction, and frustration between them. (*Id.* at 54–55, 137–39.)

 While he recognizes that Dr. Muldowny has predicted that he will likely need another neck surgery at some point in his life, Tankersley testified that he wanted to delay the surgery as long as possible because of his fear that something could "go wrong" and also because he wants to avoid putting "another big load on my wife." (*Id.* at 69–70.) Thus, he is willing to continue with ablations every six months until the ablations lose their effect and his back pain becomes such that he is unable "to stand it anymore" at which time surgery will need to be performed. (*Id.* at 71–72.)

He testified that while he is still able to do some team roping competitions and practice, because of his injuries, the frequency has increasingly diminished. (*Id.* at 59–60.) His competitions went from two to three times a week, (*id.* at 25), to doing "a few" since the accident, (*id.* at 79). His practice decreased from as many as five or six days a week, four to five hours a day, roping as many as "40 or 50 head a day[,]" (*id.* at 31–32), to two to three times a week, (*id.* at 87). He also

decreased the amount of riding during these occasions. (*Id.* at 111, 135.) When asked to assign a percentage decrease in his roping activities since the accident, Tankersley testified that he currently does only five or ten percent of what he did before the accident. (*Id.* at 110–11; see also *id.* at 135 where Mrs. Tankersley testified that while he rode horses five or six days a week before the accident, "he has not been able to do that very much at all" since the accident). In addition, he has had to modify the way he does these activities. (*See, e.g.*, *id.* at 64, (roping); *id.* at 113–14 (saddling the horse).)

According to Tankersley's wife Stacie, "It's been months and months" since she remembered him roping, (*id.* at 172); indeed, she estimated his last roping practice at the house was "close to a year ago[,]" (*id.* at 172–73), and after the surgery, he did so only "a few times[,]" (*id.* at 172). When he does team roping, it sometimes takes 2 to 3 days for him to recover "because I'd be miserable." (*Id.* at 58.) Although this is very frustrating for him, when asked why he continues to do it despite the pain, he testified, "I love it*,* and that's who I am. I've done this my whole life." (*Id.* at 58–59.)

In terms of keeping up with the work needed at Tankhill, Plaintiff has had to hire extra help and also ask the children and grandchildren to help. (*Id.* at 47, 60, 144–45.) He has purchased extra equipment to allow jobs formerly done by hand to be done mechanically. (*Id.* at 52, 72–73.) While he continues in his business of hauling alfalfa and continues to help load it, he purchased a mechanical device which lifts the bales to and from the back of his truck. (*Id.* at 52, 136.)

He is no longer able to play sports, games, activities, and wrestle with his grandchildren like he did before the accident. (*Id.* at 56.) However, when asked to describe "the worst thing that has happened to you as a result of your injuries," Tankersley testified:

> I guess it's the emotional part of not - - of seeing my wife struggle with her having to take care of me. I'm not one that likes people taking care of me. I do my own. I

21

take care of myself and I provide for my family and that has affected me being able
to provide for my family like I normally did.

(*Id.* at 72.)

Tankersley's wife Stacie corroborated this testimony, stating that "if he doesn't feel like he
brings enough to the table or he can't provide, then it affects him." (*Id.* at 148.) She testified that
the physical pain along with his concern about the continuing ablations and the inevitable future
surgery have also adversely affected his mental state. (*Id*. at 148–49.)

In sum, after reviewing the testimony of Plaintiff's treating doctors and medical records
and listening to the testimony of Tankersley and his wife, the Court rejects Defendants' argument
that Tankersley's injuries were not serious. Indeed, based on the medical and lay testimony
summarized above, the Court finds that Tankersley suffered serious, permanent, and life-changing
injuries as a result of the accident.

Plaintiff suggests a total general damages figure of $2,748,000, (Doc. 103 at 19), citing
cases that range in total general damage awards from $1,950,000 to $2,250,000 and asks the Court
to upwardly adjust the award for inflation, (*id.* at 17–18 (citations omitted).) Despite stipulated
liability, Defendants do not suggest an amount for general damages. (Doc. 104 at 9–13.)

The Court has carefully reviewed the cases cited by Plaintiff and find them to be
distinguishable. While not identical, the Court finds the case of *Johnson v. Neill Corp.*, 2015-0430
(La. Ct. App. 1 Cir. 12/23/15); 2015 WL 9464625 (unpublished)[10] persuasive and sufficiently
similar to the present case to guide the Court's general damage award. In *Johnson*, District Judge
Robert Downing awarded $700,000 in general damages, consisting of $250,000.00 for pain and

---

[10] "The Louisiana First Circuit Court of Appeal posts unpublished opinions and writ decisions on its website, and as
such, these opinions may be cited as authority." *Cook v. Cook*, 2021-1558 (La. Ct. App. 1 Cir. 7/7/22); 344 So. 3d 670,
672 n.2 (citing *Elee v. White*, 19-1633 (La. Ct. App. 1 Cir. 7/24/20); 2020 WL 4251974 at *3 (unpublished opinion).

suffering and mental anguish and distress; $250,000.00 for loss of enjoyment of life; and

$200,000.00 for permanent disability.

In *Johnson*, the plaintiff was a physician, who, while

> in high school . . . played varsity sports since ninth grade, including volleyball, basketball, and softball, and was voted most athletic of her high school class. She stated was also very active in the band program, participating in the jazz band, concert band, and marching band, and serving as the drum major for three years. [She] explained that she maintained her active lifestyle after high school by competing in triathlons, walking, jogging, swimming, biking, working out on elliptical machines, and lifting light weights. Before the [injury], she worked very long, hard hours, often working through lunch, on weekends, and on her half-day off, and exercised six days a week.

*Johnson*, 2015 WL 9464625, at *12.

While undergoing a massage, the plaintiff suffered a disc herniation of L4-5, with an L5

nerve root impingement for which she underwent a percutaneous endoscopic discectomy at L4-5.

*Id.* at *14. Despite an initial period of improvement her condition deteriorated to the point where

her doctor testified that the

> quality of [her] life was poor, considering that she was only able to go to work, which was a daily struggle for her. He testified that because her job requires her to mostly sit, stand, engage patients, and bend over to examine them, due to the mere stress on her back from working, she is not able to do much more once she gets home from work, other than to eat, sleep, and try to get ready for the next day.

*Id.* The trial court described her condition as having "lost the ability to do all the things that made

her life worth living, rid[ing] her bike, working out, doing anything in the evening, going

anywhere, meeting anybody . . . . We work to live; now [plaintiff] lives to work, and that looks

like all she is doing now." *Id.* at *15. Plaintiff's treating neurosurgeon opined that she would need

another back surgery. *Id.*

Tankersley, like the plaintiff in *Johnson*, was extremely physically engaged in both his

work and recreational activities for most of his life. He pursued his horse riding and team roping

passionately and, indeed, testified that "that's who I am." (Doc. 100 at 59.) Like in *Johnson*, Tankersley has been able to continue doing some with a severe diminishment of the physical activities associated with his work. Tankersley returned to some of his pre-accident roping activities but even with altered techniques, has done so with increasingly diminished frequency because of the pain that it caused. His normal work activities associated with running his ranch have been severely curtailed. Like in *Johnson*, Tankersley suffers ongoing pain, continued treatment (in the form of periodic ablations) and will ultimately need surgery.

The Court finds therefore that a fair and adequate award for Tankersley's general damages, adjusted for inflation,[11] is $330,000.00 for past and future pain and suffering and mental anguish and distress; $330,000 for loss of enjoyment of life; and $265,000.00 for permanent disability.

---

[11] Recent Louisiana appellate decisions recognize that when evaluating an appropriate general damage award based on previous awards, it is appropriate to consider inflation. *Stauder v. Shell Oil Co.*, 2022-0593 (La. Ct. App. 4 Cir. 6/3/24); -- So. 3d ---, 2024 WL 2812621 at *5 (finding it appropriate to consider "other factors, such as inflation"); *Boyance v. United Fire & Cas. Co.*, 2023-442 (La. Ct. App. 3 Cir. 4/3/24); -- So. 3d ---, 2024 WL 1649770 at *7 ("Adjust[ing] for inflation as of the May 2022 trial date, using the U.S. Bureau of Labor Statistics Consumer Price Inflation Calculator"). *See also Pete v. Boland Marine & Mfg. Co., LLC*, 2023-00170 (La. 10/20/23), 379 So. 3d 636, 651 (where opinion of Justice Griffin, concurring in part, dissenting in part, stated, "I would further overtly acknowledge the reality that general damages awards will fluctuate and increase over time given changes in economic conditions, including inflation." (citing *Walker v. Anco Insulations, Inc.*, 22-0763 (La. Ct. App. 4 Cir. 5/3/23); -- So. 3d ---, 2023 WL 3237690 (citing *Coco*, 341 So. 2d at 335–36))) In making its adjustment for inflation, the Court used the U.S. Bureau of Labor Statistics Consumer Price Inflation Calculator, as did the court in *Boyance*, *supra*.

**Summary of Damages**

The Court finds that Plaintiff Mickey J. Tankersley suffered the following damages as a result of the admitted fault of Defendants:

| | |
|---|---|
| Property Damage | $500.00 |
| Past Medical Expenses | $161,158.78 |
| Future Medical Expenses | $245,367.00 |
| Past Loss of Earning Capacity | $210,125.00 |
| Future Loss of Earning Capacity | $366,649.00 |
| Past and Future Physical Pain and Suffering and Mental Anguish | $330,000.00 |
| Loss of Enjoyment of Life | $330,000.00 |
| Permanent Disability | $265,000.00 |
| Total | $1,908,799.78 |

## VIII.  CONCLUSION

Accordingly,

**IT IS ORDERED** that judgment will be entered in favor of Plaintiff Mickey J. Tankersley and against Defendants Timothy J. Stephens, S&J Potashnick Transportation, Inc, Baldwin & Lyons, Inc.,[12] and Protective Insurance Company, in solido, in the sum of $1,908,799.78 with legal interest thereon from date of judicial demand until paid and for all costs of these proceedings.

---

[12] While the evidence did not make clear what role, if any, Baldwin and Lyons, Inc. played in the accident, "Defendants have stipulated to liability in this matter[,]" (Doc. 63 at 2), and therefore defendant Baldwin and Lyons, Inc. will be cast in judgment.

**IT IS FURTHER ORDERED** that Mickey J. Tankersley shall be entitled to costs upon application in accordance with M.D. La. Civ. R. 54(a), (c) including expert witness fees for the doctors who testified by deposition: David S. Muldowny, M.D.; Malcom J. Stubbs, M.D.; and Sean Stehr, M.D.

Signed in Baton Rouge, Louisiana, on June 25, 2024.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**